# IN THE COURT OF APPEALS OF IOWA

————————————

No. 26-0606
Filed June 10, 2026

————————————

**In the Interest of C.B., Minor Child,**

**B.B., Mother,**
Appellant.

————————————

Appeal from the Iowa District Court for Wapello County,
The Honorable Richelle Mahaffey, Judge.

————————————

**AFFIRMED**

————————————

Jeffrey A. Smith, Oskaloosa, attorney for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney
General, attorneys for appellee State.

Ryan J. Mitchell of Orsborn, Mitchell & Goedken, P.C., Ottumwa, attorney
and guardian ad litem for minor child.

————————————

Considered without oral argument
by Schumacher, P.J., and Ahlers and Badding, JJ.
Opinion by Badding, J.

**BADDING, Judge.**

Once again, an Iowa family is torn apart by methamphetamine. The mother in this case has struggled with the drug for longer than her youngest son (born in 2019) has been alive. With no end in sight to her cycle of addiction, the juvenile court terminated her parental rights. Reviewing that ruling de novo, we now affirm.

## I.     Background Facts and Proceedings

The mother has more than a decade of history with the Iowa Department of Health and Human Services. Her struggle with substances—which goes back just as far—led to previous removals of her three older children.[1] This case began in October 2023, when the department received reports that the mother was caring for her youngest son while under the influence. The mother refused to cooperate with child protective workers, and so the juvenile court ordered the child removed. He was later adjudicated as a child in need of assistance.

The mother—who had completed inpatient drug treatment during a past child welfare case—eventually acknowledged her relapse. In a case plan adopted by the juvenile court in January 2024, the department required the mother to participate in random drug testing. One urinalysis in March came back positive for methamphetamine. The mother missed several others. Months later, she entered a residential treatment program. But the department continued to worry about the mother's history with methamphetamine. In an August 2024 report, the department wrote that the

---

[1] The mother's rights to her oldest child were terminated in 2004, although the mother denies that drug use was the reason. Protective proceedings for the two middle siblings were closed by bridge order.

mother would need "to be able to follow through with a safety plan for if she relapses again," including by "holding herself accountable for her use."

The State petitioned to terminate the mother's parental rights in September 2024, and a hearing was set for February 2025. Meanwhile, the mother graduated from her inpatient recovery program and returned a series of negative drug tests. She continued to participate in outpatient substance use and mental health treatment, earning increased visitation with the child. Heartened by this progress, the department recommended—and the juvenile court granted—additional time for the mother to work toward reunification.[2]

The positive momentum continued until April 2025, when roughly two weeks after she completed outpatient treatment, the mother's hair tested positive for a low level of methamphetamine. Around the same time, the department learned that the child's foster placement would discontinue care due to his increasing behavioral needs. The department reported:

> This leaves a difficult . . . decision to make. What is in the best interest of [C.B.] long term? The department's ideal path would be finding a family that is able to meet [the child's] needs that could be a long-term option if needed. Realistically, this home might not be out there or might take months and multiple placement changes to find. The second option is to return [C.B.] to [the mother's] care, understanding he might have to be removed again which also adds to his trauma. Yet, it could also be successful and allow [C.B.] to be where he wants to be, with his mom. There is no magic ball to give the answer.

Ultimately, the department advised that reunification would be "the least traumatic option." The juvenile court agreed and ordered the child returned to the mother's custody at the end of June. It noted that while the mother's

---

[2] The parental rights of the child's biological father were terminated in the same order, which was the subject of a separate appeal.

April relapse appeared to be isolated, her progress remained "precarious" and "there [was] no room for error." The court ordered the mother to continue participating in monthly drug screens, additional substance use treatment, and mental health therapy.

The child remained in his mother's custody for about five months. During that time, the mother's drug tests were negative. In a September 2025 report, the department was "cautiously optimistic regarding the [mother's] ongoing stability and sobriety." But soon there were signs of a relapse. The child began arriving late to school, and his teachers noticed worsening behaviors. Drug paraphernalia was found at the mother's home, but it may have been from her older son. Then, in November, the mother stormed out of a testing facility without providing a sample. When questioned by a case manager, she admitted to using methamphetamine a couple of times that fall. The child was once again removed.

In March 2026, the State renewed its petition to terminate the mother's parental rights. At a hearing that same month, the mother asked the juvenile court to give her one more chance to prove her sobriety. She suggested a recent change in her mental health treatment had positioned her for a better chance of success. The court declined, finding the mother had received "ample time and opportunity to demonstrate that she can be a safe, stable, and sober parent" and that termination was in the child's best interests. The mother now appeals.

II.    Analysis

We review termination of parental rights under a familiar three-step framework, asking first whether a statutory ground for termination has been established. *In re L.A.*, 20 N.W.3d 529, 532 (Iowa Ct. App. 2025) (en banc). Here, the juvenile court found the State's evidence satisfied Iowa Code

4

section 232.116(1)(e), (f), (g), and (*l*) (2026). Challenging those grounds in a single claim of error, the mother asserts the court was wrong to conclude "that she is not able to have the child safely returned to her care now or in the foreseeable future." The State contends this one-size-fits-all argument does not "sufficiently raise dispute to the four grounds for termination" and so the mother has "waived her challenges."

We agree that the mother's petition fails to identify a reviewable issue as to each of the four grounds on which the juvenile court relied. And we could end our analysis there. *See, e.g.*, *In re J.M.*, No. 25-2007, 2026 WL 685837, at *1 (Iowa Ct. App. Mar. 11, 2026) (finding a father waived his statutory-grounds challenge by declining to address each of the grounds for termination). That said, we choose to address the substance of the mother's argument, which we interpret primarily as a challenge under section 232.116(1)(f). That ground required the State to show, among other things, that the child could not be safely returned to the mother's custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(f); *In re J.R.*, 20 N.W.3d 839, 843 (Iowa Ct. App. 2025).

Acknowledging "her previous struggles" with methamphetamine, the mother contends that she could "demonstrate her ability to protect her child from adjudicatory harm" if given more time. She points to her successful discharge from inpatient drug treatment and her "long periods of sobriety" as evidence of her commitment to safe and sober parenting. We do not overlook those achievements. The mother's progress during this two-and-a-half-year-long case convinced the department to delay its first attempt at termination and led to the temporary return of her son. But with each step forward came another step back. And when the termination hearing arrived, the mother remained trapped in a longstanding cycle. A saliva sample

collected just two weeks before the hearing tested positive for methamphetamine. The mother admitted to more recent use on the stand.

As we have recognized before, a "parent's methamphetamine use, in itself, creates a dangerous environment for children." *In re B.K.*, No. 25-1767, 2026 WL 380831, at *2 (Iowa Ct. App. Feb. 11, 2026) (citation omitted); *see also In re C.H.*, No. 23-1079, 2023 WL 7015345, at *2 (Iowa Ct. App. Oct. 25, 2023) ("The mother's positive test for methamphetamine two months before the termination hearing precluded the children's return to her custody."). That danger is compounded by the mother's lack of accountability. *See In re A.B.*, 815 N.W.2d 764, 776–77 (Iowa 2012) (affirming termination where, contrary to the evidence, a father "refused to acknowledge" his unresolved, chronic drug addiction).

Throughout this case, the department showed patience for the mother's struggle with addiction. It did not ask for perfect progress—only for the mother to "hold[] herself accountable" in the event of a relapse. When those setbacks came, the mother resisted tests and avoided disclosure. A case manager testified that the mother's lack of candor about her drug use left no assurance that she could safely supervise her son. We agree. Clear and convincing evidence shows the child could not be returned to her custody at the time of the hearing. *See J.R.*, 20 N.W.3d at 843. Because the age, adjudication, and removal requirements of section 232.116(1)(f) were also satisfied, we find the State met its burden to prove a statutory ground for termination.

Turning to the second step in our analysis, the mother also claims that termination was not in the child's best interests. *See A.B.*, 815 N.W.2d at 776 ("Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the children's best

interests."). When reviewing that question, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). Termination of parental rights, as the mother stresses in her petition, "is an outcome of last resort." *In re B.F.*, 526 N.W.2d 352, 356 (Iowa Ct. App. 1994). And yet, where the legislative criteria for termination have been satisfied, "we cannot deprive a child of permanency . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014).

This child has spent most of his life waiting on that hope. In less than seven years, he has been removed from the mother's custody three times and fostered in eight homes. The case manager testified:

> I have seen the effect that that has had on [C.B.], how he has struggled with the changes, not knowing, feeling like he's not loved and wanted. . . . [H]e has been waiting and waiting so long for his mom to do what's needed, and I think truly [she] wants to. I don't think [the mother] wants to continue to use, but there is something that she has not addressed that causes her to continue to do that. In more time she might be able to do well for a short period of time, but that doesn't mean it will be a lasting outcome for [the child], and he really needs that permanency. He needs to know where he's going to stay, who's going to care for him, that he's not going to keep getting removed and bounced around.

We decline to extend the limbo any longer. In December 2025, the child was placed with a pre-adoptive foster family, and he remained in that placement at the time of termination. The case manager and guardian ad litem agreed that the child was thriving, noting improvements in his communication, as well as at school. And the case manager reported that the foster parents were open to supporting a relationship between the mother and her son. Weighing the promises of this placement against the thin hope of

lasting change at home, we conclude that termination of the mother's rights will serve the child's best interests.

Finally, the third step in our analysis asks whether a statutory exception should preclude termination. *L.A.*, 20 N.W.3d at 532. To that end, the mother's petition appears to contend section 232.116(3)(a) applies. We find no basis for that claim. Under section 232.116(3)(a), the juvenile court may spare a parent's rights when "[a] relative has legal custody of the child." But there is no dispute that at termination, this child was in the department's custody. It is a parent's burden to show a permissive exception applies, *In re A.S.*, 906 N.W.2d 467, 475–76 (Iowa 2018), and the mother has not done so here.

**AFFIRMED.**